UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:07-CR-44 |
| | ) | |
| V. | ) | (Philips / Shirley) |
| | ) | |
| SCOTT EDWARD WILLYARD, | ) | |
| | ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDATION**

All pre-trial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Scott Edward Willyard's ("Defendant Willyard") Motion to Suppress Statements and Physical Evidence [Doc. 113], and his Motion to Suppress Evidence Pursuant to Rules 104, 401, 402, 403, and 404(b), both filed on September 17, 2007. The government has filed a Memorandum in Opposition [Doc. 145]. The parties appeared before the Court on November 2, 2007 for an evidentiary hearing. The government was represented by Assistant United States Attorney Hugh Ward ("AUSA Ward"). Attorney Robert Vogel ("Attorney Vogel") represented Defendant Willyard, who was also present. At the conclusion of the hearing, Defendant requested leave to file post hearing briefs. Counsel for Defendant was given until November 12, 2007 to file post hearing briefs. The government was given until November 19, 2007 to file a response. Defendant filed his supplemental brief [Doc. 174] on November 12, 2007, and the government filed a response [Doc. 177] on November 15, 2007.

Accordingly, the Court took these matters under advisement on November 16, 2007.

## I.    Position of the Parties

Defendant Willyard moves to suppress any and all statements and evidence seized from a search of a 2002 Ford F-150 pickup truck and Carlson box trailer on or about January 27, 2007 [Doc. 113].[1]  Defendant contends the traffic stop that occurred on January 27, 2006 was pretextual, and thus illegal.  Defendant further contends that since the stop was illegal, the subsequent detention and search of the both the trailer and his vehicle were done in violation of his Fourth Amendment rights.  Defendant further contends that since there was no probable cause to arrest him, his subsequent arrest was illegal and any statements made to law enforcement arising out of the traffic stop and subsequent arrest were made in violation of the standards set forth and established in Miranda v. Arizona, 384 U.S. 436 (1966) and were not a result of a knowing, intelligent, and voluntary waiver of his constitutional rights.  Defendant argues that since the search of his vehicle and trailer were illegal, thus any evidence obtained from said search should be suppressed.  Defendant also requests, pursuant to Federal Rules of Evidence 104, 401, 402, 403, and 404, that this Court suppress any and all evidence recovered incident to the traffic stop and his subsequent arrest on or about January 27, 2006 in Lonoke, Arkansas [Doc. 114].  Defendant contests the admissibility of the evidence on the grounds of relevancy (Fed.R.Evid. 104; 401; and 402); unfair prejudice if determined to be relevant (Fed.R.Evid. 403); and inadmissible prior bad acts

---

[1]Defendant also requests this Court suppress all evidence obtained from the use of any wiretaps, execution of any search warrants, and/or from or as a result of any warrantless searches and the fruit thereof [Doc. 113].  However, Defendant fails to show the Court how any evidence regarding or resulting from these searches and seizures were illegal or "unreasonable" or would be admissible against him at trial.  Thus, the scope of this Report and Recommendation only covers the traffic stop in Lonoke, Arkansas and subsequent arrest on January 27, 2006.

(Fed.R.Evid. 404(b)).

The government, in response, argues when Defendant's vehicle was stopped on January 27, 2006, the Arkansas state police trooper conducted a valid traffic stop [Doc. 145]. The government contends the traffic stop occurred as a result of a moving violation on Interstate 40. The government further argues that Trooper Coleman, the Arkansas State Police Trooper who conducted the stop, then observed the Defendant acting in a way, based on his training and experience, which alerted him to the possibility of, among other things, Defendant driving under the influence, thus escalating his suspicion that further investigation of Defendant and his vehicle and trailer were justified. The government further argues that all of Trooper Coleman's observations, in conjunction, allowed for him to utilize his canine and after the canine alerted on the vehicle, Trooper Coleman's reasonable suspicions developed into probable cause, which permitted Defendant's continued detention pending the search of the vehicle and trailer [Doc. 177]. Finally, the government argues after 407 pounds of marijuana was located in the trailer, Defendant was transported to Lonoke County Jail, where he was advised of his constitutional rights, and waived them.

In relation to Defendant's Motion to Suppress Evidence pursuant to certain Federal Rules of Evidence, the government argues that Defendant cites no statutory or case authority in support of his argument, thus his motion is without merit [Doc. 145].

## II.    Suppression Hearing Testimony

The only witness called by the government was Arkansas State Police Trooper Victor D. Coleman ("Trooper Coleman"). Trooper Coleman has worked for the Arkansas State Police for twenty-one years and is assigned to the Highway Patrol Division. In addition to his role as a state policeman, he is assigned to the Interstate Criminal Patrol Division. On direct, Trooper Coleman

was asked to tell the Court about his training in law enforcement. He stated that when he became involved in criminal interdiction approximately ten years ago, he was trained by members of the State Police in that field, and was trained in the law of search and seizure, compartments, and routine interviews on the side of the road. He further stated that he has attended DEA Operation Pipeline training and U.S. Customs training through Blue Lighting. Trooper Coleman advised the Court he has attended many conferences and seminars across the United States. Trooper Coleman also testified that he has traveled to the border twice, traveling with Border Patrol and training with Border Patrol and U.S. Customs on the border. He also stated he has trained with California Highway Patrol and interdiction squads in California.

Trooper Coleman was then asked about his K-9 duties. First, Trooper Coleman testified that when the State Police received Scarlet, his K-9 ("Scarlet"), he was required to go to a six week training facility, located near Hot Springs, Arkansas. He stated that Scarlet was already trained but that he needed to attend training on how to handle her. He testified that Scarlet is eleven years old. Trooper Coleman was then asked about Scarlet's training and certification. He testified that Scarlet has been certified for the last ten years and that the State Police does at least one certification with her through the National Narcotics Detector Dog Association ("NNDDA") and other certifications through other training agencies. He explained the NNDDA is completely independent of the State Police. He further stated that the State Police does a training with Scarlet at least once a year and that she is used on a day-to-day basis to search vehicles for the State Police. He also testified that she is tested by the State Police on a weekly basis. Trooper Coleman testified she is certified in marijuana, cocaine, heroin, and methamphetamine. Trooper Coleman was then asked about Scarlet's reliability rate. He testified that Scarlet is about eighty percent reliable when narcotics

have been found in the vehicle.

Trooper Coleman was then asked about the date in question, January 27, 2006. He testified he was working Highway Patrol duties on Interstate 40 in Lonoke County, he was not working with a partner, and that he had Scarlet with him. He testified that he stopped a vehicle with Tennessee license plates and that the person driving the vehicle he stopped was Defendant Willyard. He further testified that he observed Defendant Willyard's trailer cross over the white line on two occasions, which he testified is a traffic violation in Arkansas. Trooper Coleman then testified that when he saw the trailer cross the white line, he thought Defendant was either under the influence of some type of narcotic or alcohol or perhaps just tired. At this point, the government offered into evidence a DVD of the traffic stop taken from the video camera in Trooper Coleman's cruiser [Ex. 1].

Trooper Coleman testified that after he pulled Defendant over, he returned to his cruiser to run a criminal history check and a check on Defendant's driver's license to verify it was valid. Trooper Coleman further testified Defendant Willyard indicated to him that he had some prior criminal history and that there may be a possible warrant out for his arrest. He then stated he ran a prior criminal history check on Defendant and that there was an outstanding warrant from Oregon for "burglary or domestic and burglary." When asked whether the outstanding warrant was significant, Trooper Coleman stated that it was because it showed a prior criminal history.

Trooper Coleman then testified that Defendant Willyard refused consent to search the vehicle and trailer, so at this time he used Scarlet on the exterior of the vehicle. He further testified that Scarlet alerted when she went by the rear of the trailer and on the door, which was locked. Scarlet also alerted on the door of the passenger side and the driver's side of the truck. At this time, he stated he told Defendant to open up the back of the trailer so that he could search the truck and the

trailer. He further testified that he ultimately found twenty-two bundles of marijuana in the trailer. Trooper Coleman then testified that Defendant Willyard was arrested and transferred to Lonoke County Jail. He further testified that DEA was advised of Defendant Willyard's arrest.

On cross-examination, Trooper Coleman was asked about his specific assignment from Highway Patrol. He stated that his primary duty is to look for traffic violations and then based on those violations, to try to question the person and determine whether there is any criminal activity occurring. He stated that he does not investigate every person who is stopped for a traffic violation for criminal activity and further stated that he cannot give a number to the amount of people investigated after the initial traffic violation stop. He testified it depends on the criminal indicators that are shown as a result of the search; criminal indicators include: ownership of the vehicle; prior criminal history; where the driver is driving to and from; body behavior; and whether or not he feels the individual is being deceitful. He further stated that deceitfulness is based on how the individual responds to questions asked.

Trooper Coleman was then asked about the video camera in his cruiser which records his traffic stops; specifically he was asked at what point does the camera turn on and start recording. Trooper Coleman testified that the video starts recording on when he turns the cruiser's blue lights on.

Trooper Coleman was then asked about the weather on January 27, 2006. Trooper Coleman testified that he remembered it was a cool day, and from reviewing Ex. 1, it looks like it was overcast, but could not recall whether it was windy. He stated that it is normal in windy conditions for people pulling trailers to weave some. He further testified that he did not remember how far Defendant went over the line, but that Defendant crossed it twice, in violation of the traffic statute.

Trooper Coleman further testified that he pulled directly behind Defendant's vehicle on his return to the Interstate from another traffic stop, which was the first time he noticed the Tennessee license plate. He stated that there are source areas and origin areas for narcotics that travel in other parts of the country, which are associated with narcotics trafficking, and that Tennessee is an alert. He further clarified his testimony in stating that Arkansas gets a lot of narcotics traveling through from Memphis and Nashville, but that a Tennessee license plate is not of interest in and of itself because there is a significant amount Tennessee traffic on I-40 between Little Rock and Memphis for legal purposes. He testified that the Tennessee border is about 100 miles from where he was on I-40. He also testified that trailers and trucks are fairly common to be used in the trafficking of narcotics, thus the Tennessee tag on the trailer and the trailer raised his suspicion that there might be some drug trafficking occurring.

Trooper Coleman then testified that once he pulled Defendant over he started to ask him questions about being tired, where he was coming from, and where he was driving to. Trooper Coleman explained this type of conversation is customary in a traffic stop. He further explained that when he is conducting a traffic stop, he asks the person to exit the vehicle unless the driver is elderly or it is bad weather. He stated he has the driver walk to the police cruiser for safety reasons since he is exposed to I-40 traffic when he initially approaches a stopped vehicle. He further testified, that in this case, he had Defendant Willyard go to the rear of the trailer between his vehicle and the police cruiser. As Ex. 1 showed, Trooper Coleman then testified that he asked Defendant at this point what he was hauling in the trailer. Trooper Coleman stated this is normal conversation during a traffic stop because he trying to determine what is going on inside the vehicle.

The video exhibit then showed Trooper Coleman asking Defendant Willyard for consent to

search the vehicle. Trooper Coleman testified that his reasonable suspicion in asking for consent to search the vehicle and trailer stemmed from the two locks on the back doors of the trailer. He testified that the locks on the trailer appeared to be new, but that Defendant Willyard told him the trailer was empty. Furthermore, he testified Defendant Willyard was extremely nervous when he handed over his driver's license, he was aware of prior criminal history in light of the outstanding warrant from Oregon, and that Defendant indicated a prior criminal history for drugs. Trooper Coleman testified, in his opinion, all these factors taken together meet the threshold of reasonable suspicion to request consent. He further stated that when he is told by someone what they have an outstanding warrant out on them, he is suspicious of their activity in current criminal activity and that since Defendant was traveling on a long distance across the country, it could possibly link him to drug trafficking.

Trooper Coleman testified at this time, after Defendant refused to grant consent, he ran Scarlet on the trailer. He further stated he thought he had a right to run Scarlet on the trailer in light of the factors listed above as well as the fact that Defendant was traveling on a long distance across the country, which could tie him to trafficking in some narcotics. Trooper Coleman testified prior to this stop he had not received any prior communication from anyone in East Tennessee concerning any tips that people might be hauling drugs from the West.

Cross-examination continued and Trooper Coleman was asked about Scarlet's certification. Trooper Coleman was shown the most recent certification of Scarlet's, which was dated February 28, 2005 [Ex. 4]. Furthermore, Trooper Coleman testified that when he says "good girl" to Scarlet, it means Scarlet has alerted on the vehicle. Additionally, when he says "here it is", he is encouraging her to work, but that it is not an indication to Scarlet to alert now or at a certain area

on the vehicle. Trooper Coleman further testified that when Scarlet starts showing an interest in the vehicle, *i.e.*, when her breathing changes, he will slow down and possibly stop to let her work back and forth on the vehicle. Attorney Vogel asked whether Trooper Coleman used any type of signal or body language to help guide Scarlet where to look, to which Trooper Coleman said no. He testified he pulls back only when Scarlet has a hit on an area.

Trooper Coleman then testified that at this point in the traffic stop, he put Defendant Willyard in handcuffs and another officer arrived to help with the search of the vehicle and trailer. He further testified that he called for DEA Investigators to come and assist him; the DEA Investigators met Defendant Willyard at the Sheriff's Department. Trooper Coleman stated he did not recall if he continued to ask Defendant questions at this time. He further stated that he did not read Defendant Willyard his <u>Miranda</u> rights, but that Defendant was advised of those rights when he arrived at the Sheriff's Department. Trooper Coleman further stated an audiotape was made of Defendant Willyard's statement to the Sheriff's Department, but that he did not participate in Defendant's interrogation.

On redirect examination, Trooper Coleman stated that when he first approached Defendant Willyard, the Defendant did not appear to be tired, thus his initial concern was that Defendant was driving under the influence, which is why he engaged him in conversation.

On recross examination, Trooper Coleman was asked if there was any indication throughout the stop that Defendant Willyard was under the influence of narcotics or alcohol, to which Trooper Coleman replied no. He was further asked whether the statute Defendant Willyard allegedly violated actually cites crossing the right-hand line or the center line, to which Trooper Coleman replied that crossing any dividing line on a controlled access highway violates the statute.

Prior to the conclusion of the hearing, the Court asked Trooper Coleman to further clarify the line Defendant crossed. Trooper Coleman replied that it was the line prior to going on to the rumble strip on the shoulder, the white line, not the line that separates two lanes of traffic.

### III.    Findings of Fact

The Court makes its factual findings in the analysis section of the report.

### IV.    Analysis - Motion to Suppress

Defendant Willyard contends that his rights under the Fourth Amendment were violated because (1) Trooper Coleman did not have reasonable suspicion to stop and detain him on January 27, 2006; (2) the warrantless search of his vehicle and trailer was unreasonable because he denied consent to search the vehicle and the search was conducted prior to his arrest; and (3) there was no probable cause to arrest him until the illegal search of the vehicle occurred. Defendant Willyard further contends that Trooper Coleman's testimony at the evidentiary hearing is unreliable and uncorroborated. He further argues that any statements he made once arrested were made in violation of the standards set forth in Miranda v. Arizona, as they were not the result of a knowing, intelligent, and voluntary waiver. He also argues that the results of the canine search are unreliable because the officer clearly coached Scarlet [Doc. 174]. The government, on the other hand, contends that Trooper Coleman lawfully stopped Defendant's vehicle for a traffic violation, and thus was able to ask Defendant to exit the vehicle. The government further contends based on Trooper Coleman's experience and training, Trooper Coleman observed Defendant in such a way which gave rise to reasonable, articulable suspicion that Defendant was engaging in criminal activity, namely that he

was driving under the influence. Moreover, the government contends Defendant's assertion that Trooper Coleman should not be considered to be a credible witness by this Court is baseless. The government argues Trooper Coleman testified to his training and Scarlet's certification and Defendant did not present any evidence to refute any aspect of the testimony. Finally, the government argues Defendant has not met his burden in showing any statements made were the result of police coercion or government deception.

As a threshold matter, the Court must first start with Defendant's objections to Trooper Coleman's credibility and his use of Scarlet on the vehicle and trailer. Then, the Court will examine the propriety of the traffic stop and Defendant's claim any statements made were done in violation of his Miranda rights.

**A. Credibility of Trooper Coleman as a Witness**

In the case before the Court, Trooper Coleman's testimony was the only testimony presented. Defendant Willyard claims that the Court should not credit his testimony as Trooper Coleman "has learned, through his training, what to say in court" [Doc. 174]. At the evidentiary hearing, Trooper Coleman was subjected to vigorous cross-examination by Attorney Vogel. However, he was neither patently impeached nor proved to be a biased witness.

This Court is entitled to credit the testimony of a witness based on their testimony provided in court. See United States v. Bradshaw, 102 F.3d 204, 210 (6th Cir. 1996) (holding that since the District Court is in the best position to judge credibility, its findings of fact should not be disturbed unless clearly erroneous). In this instance, the Court credits the testimony of Trooper Coleman because he is a well-trained member of law enforcement, has not been shown to be biased in any way, and his testimony was not impeached in any material way nor controverted by any other

testimony. The Court observed his demeanor and manner while testifying. From all of this, the Court finds Trooper Coleman to be a credible witness.

Although the Court recognizes Defendant's concern, and also has some concern of its own, regarding the apparent discrepancy in testimony as to when the video camera in Trooper Coleman's cruiser started recording, the Court finds it does not affect Trooper Coleman's credibility in testifying as to the traffic violation committed. Even if the video camera started recording once Trooper Coleman turned on his blue lights to signal to Defendant to pull to the side of the road onto the shoulder, from the testimony, it appears this would still have been after the traffic violation occurred, thus not recording Defendant's vehicle and trailer crossing the line twice in violation of the Arkansas statute. The Court finds the traffic violation would have occurred prior to Trooper Coleman turning on his blue lights in order to give him a basis to pull Defendant over. Thus, the traffic violation would not be available for review of this Court. Although the video recording starts with Defendant already on the shoulder and Trooper Coleman pulling up behind him, the Court finds the delay to be somewhat inconsistent, but legally inconsequential. Based on Trooper Coleman's testimony, which this Court finds credible, Defendant crossed the white line which separates the lane of travel from the shoulder twice, and that Defendant's vehicle was traveling in the closest lane to the shoulder prior to being pulled over. Thus, since the blue lights would have likely have been activated to give Defendant notice of being pulled over and he was in the lane closest to the shoulder, the Court finds Trooper Coleman's discrepancy in testimony as to when the video camera usually turns on and when it begins recording and when it actually did in this case to be inconsequential to his overall credibility in light of the slight delay and the fact that the traffic violation had already occurred.

**B.     Reliability of Scarlet, the K-9**

The use of trained narcotics dogs is an accepted investigative technique in the Sixth Circuit. United States v. Diaz, 25 F.3d 392 (6th Cir. 1994). Accordingly, when a trained narcotics dog "alerts" to an item, this factor alone constitutes probable cause to arrest whomever is in possession of the narcotics. See United States v. Place, 462 U.S. 696, 707 (1983); United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998). In this case, Defendant contends Scarlet was coached by Trooper Coleman, thus her "hits" on the vehicle were unreliable, thus the search was illegal.

From Diaz, it is clear that for evidence of the dog's alert to be admitted on the issue of probable cause, all that is required is evidence the dog is generally certified as a drug-detection dog. Questions about the quality of the dog's training, performance in the field, and other issues go to credibility and not the admissibility of the evidence. United States v. Howard, 448 F.Supp.2d 889, 897 (E.D. Tenn. 2006) (citing United States v. Boxley, 373 F.3d 759, 762 (6th Cir. 2004); United States v. Hill, 195 F.3d 258, 273 (6th Cir. 1999)). While further evidence is not needed to allow the admission of testimony relating to the dog's alert, it may be relevant to the extent it can be used to challenge the "credibility" of the dog.

The key component of a drug-dog detection is the communication by the dog that is has recognized the target sense. See Howard, 448 F.Supp.2d at 898. There are two components of the communication: communication by the dog and recognition by the handler that the dog has detected the target scent. Id. This is what it referred to as the dog's "alert." Dogs alert in many different manners, thus training plays the essential role in the communication of the alert between the dog and the handler. Id.

According to the Howard court, "training a dog is a relatively simple task," but "training a

handler to correctly recognize how a dog responds to targeted narcotics typically requires more time and effort." Id. (citations omitted).  Thus, handlers and dogs are paired at the beginning of a training program and continue to work together for the dog's years of service.  Id.  When a dog is "sniffing", the handler "must interpret the dog's action correctly."  Id. at 899.

In this case, the Court finds the fundamental determination in evaluating the training and reliability of a drug-detection dog is the reliability of the dog which may be established through the credibility of the handler's testimony.  See United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004).  Because the handler is the only witness who can speak and, in this case, did testify to the subjective interaction during a particular dog alert, it is necessary to defer to his testimony if it is found to be credible.  The Court further finds Scarlet to be reliable based on her training, her certifications, and her field reliability, pursuant to United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994).  As discussed above, the Court finds Trooper Coleman to be a credible witness.  Furthermore, this Court finds he sufficiently established his and Scarlet's training.  He stated that upon receiving Scarlet, he attended a six week school in Arkansas, which this Court finds is the training necessary to be able to work with Scarlet and become familiar with her alerts.  Further, Trooper Coleman testified that Scarlet has only been a K-9 in her years of service and has been certified for the last ten years.  This Court finds Trooper Coleman's testimony to be credible as he throughly laid out of the requirements of his training, Scarlet's training, and no other evidence was presented to dispute it.  Further, this Court finds sufficient evidence was not presented to dispute his testimony regarding the conduct of the alert.  Trooper Coleman testified the "good girl" language and the slowing on his part are part of his training in order to work with Scarlet, which is necessary in order to recognize her signals.  Any evidence or argument to the contrary goes only to the credibility and weight

regarding accuracy, not the dog's qualifications or admissibility.  See Boxley, 373 F.3d at 761.

C.    **Traffic Stop**

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  Terry v. Ohio, 392 U.S. 1, 9 (1968); United States v. Cortez, 449 U.S. 411, 417 (1981).  The stop of an automobile and the detention of its occupants constitutes a seizure within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief.  Wren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976).  Finding that Defendant Willyard was seized when his vehicle was stopped by Trooper Coleman, calling into operation the protections of the Fourth Amendment, the Court must next determine whether that traffic stop seizure was reasonable.

A seizure conducted without a warrant is presumed unreasonable.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).  Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless the government proves by a preponderance of the evidence that the search was reasonable.  Id.  Generally, for the seizure of an automobile and occupants to be reasonable, there must be some type of individualized suspicion of wrongdoing justifying the seizure.

If an officer has probable cause to believe that a traffic offense or violation of the traffic code has occurred or was occurring, a resultant stop is not unlawful and does not violate the Fourth Amendment.  United States v. Graham, 483 F.3d 431 (6th Cir. 2007).  This is so even if the offense is minor and the stop is a pretext for the officer's subjective motivations in making the stop.  Wren,

517 U.S. at 813-17. When determining the existence of probable cause to stop for a traffic violation, courts:

> focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred) or whether any officer "could" have stopped the suspect (because a traffic violation in fact had occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.

Ferguson, 8 F.3d at 391. But see United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) (holding that "one isolated incident" of a large motor home partially weaving into the emergency lane for a few feet and an instant in time did not constitute a failure to keep the vehicle within a single lane, "as nearly as possible." As such it was insufficient for probable cause of a traffic violation under Tennessee Code Section 55-8-123). In Freeman, the Sixth Circuit held that an officer's "observation of the motor home briefly entering the emergency lane is insufficient to give rise to probable cause of a traffic violation and warrant an invasion of ... Fourth Amendment rights." Id. The Court notes Freeman involved one brief, isolated incident. This case, on the other hand, involves two incidents. Freeman also involved a top heavy vehicle, rounding a curve on a windy day. The circumstances of Freeman are easily distinguishable from this case and its facts. See United States v. Meyer, No. 01-3022, 2001 WL 1219394 (10th Cir. Oct. 10, 2001) (distinguishing Freeman under facts similar to these herein).

The statute Defendant is accused of violating in this case is ARK. CODE ANN. § 27-68-103

(West 2006) which states that it is unlawful for any person to "drive a vehicle over, upon, or across any curb, central dividing section, or other separation or dividing line on controlled-access facilities." This statute is different from the "as nearly as practicable" standard in the Tennessee statute.

Therefore, the Court finds, giving due weight to the experience and training of Trooper Coleman, that Trooper Coleman observed Defendant twice cross over the outside white line separating the line between the lane of traffic and the shoulder (adjacent to the "rumble strip"), in violation of state law. Thus, Trooper Coleman had probable cause to believe a traffic violation had occurred and he acted properly and reasonably when pulling Defendant's vehicle and trailer to the side of the road to issue a citation for the traffic violation.[2] Thus, even if additional pretextual subjective motivations existed, Defendant's violation of the traffic laws constituted probable cause for the stop.[3] Furthermore, the Court finds this case is distinguishable from the Freeman case in that here Defendant was observed crossing the line twice, whereas the motor home in Freeman partially crossed into the "emergency lane for a few feet and an instant in time." Id. Furthermore, the Court finds the language of the Arkansas statute is different from the Tennessee statue at issue in Freeman. In Arkansas, it is unlawful for a driver to drive across a dividing line, whereas the Tennessee statute in Freeman advises that the driver shall drive their vehicle "as nearly as practicable ... within a single

_____

[2] While Defendant's brief indicated Defendant may testify that he was moving over to avoid any possible collision with a semi-truck and in his supplemental brief argues a cross wind could have moved his trailer across the line, no such proof was offered as to either.

[3] The Court recognizes Defendant's citation to United States v.Hill, 195 F.3d 258, 266-67 (6th Cir. 1999), for the proposition for that some boundaries still exist in this Circuit as to police behavior during traffic stops. However, as Defendant acknowledges in his brief, this Court is also not "writing on a clean slate .. and is bound by [the ruling] that the motives of police are irrelevant." Hill, 195 F.3d at 266.

lane." Thus, the Court finds the reasoning employed by the Sixth Circuit in Freeman is inapplicable to the case currently before the Court.

The next issue, then, is whether Trooper Coleman's questioning Defendant if he was tired, where he was traveling from, where he was traveling to, and what he was hauling was proper. In Ohio v. Robinette, the Supreme Court considered whether a motorist's Fourth Amendment rights were violated where, after initially being stopped for a traffic violation (speeding) in which the officer decided not to issue a ticket, the officer asked the motorist whether he was carrying any contraband (the motorist said no) and whether he could search the car (the motorist said yes). 519 U.S. 33 (1996). The officer in the Robinette case testified that he routinely requested permission to search automobiles he stopped for traffic violations. Id. at 40. The Ohio Supreme Court had ruled that because the officer's questions had exceeded the scope of the traffic stop's initial purpose, the consent subsequently obtained was invalid. The Supreme Court reversed, holding that the Fourth Amendment required only that the detention and question be reasonable under the particular facts of the case and that asking a detained motorist whether he would consent to a search of his automobile for contraband, even after he had produced a valid driver's license, did not necessarily make the traffic stop unreasonable in scope or duration. Id. at 39.

In United States v. Erwin, the Sixth Circuit held that, where police officers had stopped a vehicle because they suspected that the motorist was intoxicated, "irrespective of whether the deputies were justified in detaining [the motorist] after he showed no signs of intoxication, and even if they had not, after approaching [the motorist], observed conditions raising a reasonable and articulable suspicion that criminal activity was 'afoot', they were entitled to ask [the motorist] for permission to search his vehicle. 155 F.3d 818, 822-23 (6th Cir. 1998). In United States v. Burton,

18

the Sixth Circuit held under <u>Robinette</u>, an officer's request for consent to search in the context of a traffic stop does not violate the Fourth Amendment as long as it is "a reasonable request under the circumstances." 334 F.3d 514, 518 (6th Cir. 2003). Thus, the correct legal standard is not whether the questions in the present case were "reasonable related ... to the initial inference" or based on "reasonable suspicion that other criminal activity was afoot" but rather whether the questions were "reasonable under the particular facts of the case." Accordingly, in this case, the Court must ascertain whether asking Defendant about his travel agenda and what he was hauling in the trailer were reasonable under the circumstances.

In this case, the Court finds Trooper Coleman's questioning of Defendant was reasonable "under the particular facts of the case." Trooper Coleman testified when drivers cross the lines of traffic while driving, he suspects, based on his experience, they may be driving under the influence or may be too tired to continue driving. Thus, inquiring whether Defendant was tired was proper in order to gauge the cause of going over the line and whether or not to permit Defendant to continue operating the vehicle. Also, the Court finds it was proper for Trooper Coleman to ask to see Defendant's drivers license and to run a background check, which in this case resulted in evidence of an outstanding criminal warrant. This Court finds that Trooper Coleman's discovery of the outstanding warrant justified his asking Defendant further questioning. <u>See</u> <u>Burton</u>, 334 F.3d at 518 ("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the police - for all suspects (even the guilty ones) may protects themselves by fully declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspect's consent.").

The Court finds that Trooper Coleman asked Defendant these questions in a relatively brief time span and in the course of a legitimate "traffic stop." The record also provides no reason to suspect that Trooper Coleman's questions were unusually intrusive or that asking them made this stop any more coercive than a typical traffic stop. See Burton, 334 F.3d at 518. Thus, the Court finds that the questions asked of Defendant were "reasonable under the particular facts of the case," and did not violate the Fourth Amendment.

The Court further finds it was not unreasonable for Trooper Coleman to ask Defendant to exit the vehicle so that Trooper Coleman could run a check on Defendant's drivers license. See Maryland v. Wilson, 519 U.S. 408, 412 (1997) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (holding that once validly stopped "police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."). Additionally, Trooper Coleman testified as to the safety considerations, which were apparent due to the oncoming interstate traffic in close proximity. Thus, Trooper Coleman did not impermissibly exceed the scope of the investigative detention by asking Defendant to exit the vehicle and step to the rear of the vehicle.

Once the purpose of the initial stop is completed, a motorist cannot be further detained by the police unless something that occurs during the traffic stop causes the police officer to have a reasonable, articulable suspicion that other criminal activity is afoot. United States v. Richardson, 385 F.3d 625, 629-30 (6th Cir. 2004); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). Reasonable suspicion is more than an ill-defined hunch. It must be based upon a particularized and objective basis to suspect the person detailed of engaging in some criminal activity. United States v. Cortez, 449 U.S. 411, 417-18 (1981).

The evidence here reveals that Trooper Coleman conducted a criminal history check on Defendant once stopping him, pursuant to customary practices and procedures of state troopers. Trooper Coleman was aware Defendant had a prior criminal history involving drugs. The criminal history check also confirmed that Defendant had an outstanding warrant.[4] Trooper Coleman testified, in his experience, prior criminal history for drugs and an outstanding criminal warrant raise suspicion that the person may be involved in criminal activity. He also testified that Defendant's demeanor was one of extreme nervousness and that he was further suspicious of Defendant in light of the two new locks on the trailer. Nervous, evasive behavior can be a factor in determining if reasonable suspicion exists. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Trooper Coleman stated that although two locks on a trailer are not in and of itself suspicious, the locks raised his suspicion after being told by Defendant the trailer was empty. The totality of these facts and circumstances was more than sufficient to give Trooper Coleman reasonable and articulable suspicion that other criminal activity was afoot, thus the continued detainment was reasonable because of Trooper Coleman's reasonable articulable suspicion and was not in violation of the Fourth Amendment.

Next, the record reveals that Trooper Coleman asked for permission to search the vehicle and trailer, which the Defendant declined giving. Trooper Coleman then ran his canine, Scarlet, around the trailer and Scarlet alerted. Trooper Coleman then searched the vehicle and found the marijuana at issue. As stated above, Trooper Coleman has sufficient reasonable suspicion to detain Defendant long enough to run Scarlet around the vehicle. A canine sniff is not a search and does not thereby

---

[4] Trooper Coleman's testimony stated Defendant Willyard advised him of a possible outstanding criminal warrant during the initial conversation. Trooper Coleman confirmed the outstanding criminal warrant was from Oregon.

activate Fourth Amendment protections.  <u>Illinos v. Caballes</u>, 543 U.S. 405, 408-09 (2005); <u>United States v. Place</u>, 462 U.S. 696, 707 (1983); <u>United States v. Reed</u>, 141 F.3d 644, 650 (6th Cir. 1998). Once the canine sniff took place and Scarlet "alerted" on the vehicle, probable cause existed to believe the vehicle contained contraband, officers may search the entire vehicle and contents within it.  <u>See</u> <u>United States v. Navarro-Camacho</u>, 186 F.3d 701, 706 (6th Cir. 1999) ("A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance."); <u>United States v. Lumpkin</u>, 159 F.3d 983, 986 (6th Cir. 1998); <u>United States v. Mans</u>, 999 F.2d 966, 969 (6th Cir) <u>cert. denied</u> 510 U.S. 999 (1993).  Thus, Trooper Coleman's use of Scarlet on the vehicle was proper and his subsequent search of the vehicle and trailer was supported by probable cause, and thus proper under the Fourth Amendment.

>    **D.      Voluntary Waiver of <u>Miranda</u> Rights**

Defendant Willyard argues that he never knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights when law enforcement began the custodial interrogation.  The government argues that Defendant was given his <u>Miranda</u> rights and further knowingly, voluntarily, and intelligently waived his right against self-incrimination as evidenced by his decision to sign the written rights waiver form.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  As a general rule, statements made during a custodial interrogation in the absence of the procedural safeguards effective to secure the privilege against self-incrimination as set forth in <u>Miranda</u> are inadmissible.  <u>See</u> <u>United States v. Clark</u>, 982 F.2d 965, 967 (6th Cir. 1993).  An individual may waive his rights so long as the waiver is knowing, intelligent, and voluntary.  <u>See</u> <u>United States v. Doherty</u>, 126 F.3d 769, 774 (6th Cir. 1997) <u>cert.</u>

denied 524 U.S. 917 (1998) partially abrogated on other grounds, Texas v. Cobb, 532 U.S. 162, 168 n.1 (2001).  The government bears the burden of establishing the validity of a waiver by a preponderance of the evidence.  Id.; see also United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999); United States v. Wrice, 954 F.2d 406, 410 (6th Cir. 1992).

"[T]here must be an element of police coercion in order for a waiver to be found involuntary."  Seymour v. Walker, 224 F.3d 542, 544 (6th Cir. 2000) cert. denied, 532 U.S. 989 (2001) (citation omitted).  Coercion with regard to the voluntariness of statements is found when "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  Mahan, 190 F.3d at 422 (citation omitted).  The Court is to look at the totality of the circumstances in making its determination, considering such factors as the defendant's age, education, and intelligence; whether he was informed of his constitutional rights; the length and extent of the interrogation; and the use of physical punishment such as the deprivation of food or sleep.  Id. at 422-23.  Other relevant factors include the accused's physical and emotional conduct at the time of the statement, his expressed fears of violent reprisal, the proximity of the statement to a violent arrest, and the inherent  coerciveness of the setting in which the statement was made.  United States v. Murphy, 763 F.2d 202, 205 (6th Cir. 1985) cert. denied sub nom. Stauffer v. United States, 474 U.S. 1063 (1986).  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Moran v. Burbine, 475 U.S. 412, 421 (1994) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

From the evidence provided by Trooper Coleman, it appears to the Court that Defendant was

in custody when he was arrived at the Lonoke Sheriff's Department and thus, any interrogation was custodial interrogation. In this case, Trooper Coleman's testimony on this issue was only that while he did not read Defendant his <u>Miranda</u> rights, Defendant was advised of those rights when he arrived at the Sheriff's Department and that an audio tape was made of Defendant's statement, but that he, personally, did not participate in Defendant's interrogation.

The government called no other witnesses, but merely proffered that Defendant signed two written waiver of rights forms and cooperated by making DEA directed phone calls. However, neither copies of the alleged statement, nor the audio tape, nor the waiver of rights forms were provided to the Court nor placed in evidence at the evidentiary hearing. The Court certainly believes it should be provided with all pertinent information necessary to making an informed recommendation to the District Court.

The Court's analysis is further hindered because Defendant has only made a blanket, but unsupported, allegation that his statements were made in violation of <u>Miranda</u> and that the statements were not made with a knowing, intelligent, and voluntary waiver of his constitutional rights.

While ordinarily it is the case, and this Court believes it should be the case, that a defendant who makes such an allegation should make some initial showing of a lack of <u>Miranda</u> rights or lack of voluntariness so that the Court and the government are on notice of what is in issue. The government, then, must establish (due to its burden of persuasion) that <u>Miranda</u> rights were given and understood and/or that there were waivers of those rights made in a voluntary, knowing, and intelligent manner.

In this case, Defendant's brief is void of any allegation or argument disputing the giving of

*Miranda* warnings, the signing of two waiver of rights forms, or that his waivers of his *Miranda* rights were made involuntarily, unknowingly, or unintelligently. Defendant has failed to highlight any unconstitutional conduct on the part of law enforcement. There is no evidence of police coercion. Defendant has not alleged that any physical or verbal threats were made. Nor is there any evidence to suggest that weapons were brandished or that food, drink, or trips to the restroom were denied. Furthermore, there is no evidence before the Court that he suffered from a mental deficiency or illness or that he was below average intelligence. However, the Defendant does not have the burden of proving "involuntariness or the lack of a valid *Miranda* waiver" <u>United States v. Short</u>, 790 F.2d 464, 467 (6th Cir. 1986). In <u>Short</u>, the Sixth Circuit noted that the <u>Miranda</u> decision itself requires the government to prove the statements/confessions given were given by the defendant with the requisite "procedural safeguards effective to secure the privilege against self-incrimination" and that since the government is responsible for the circumstances of the interrogation and has at its disposal the evidence of warnings and waivers given, "the burden is rightly on their shoulders." <u>Id.</u> (citing <u>Miranda</u>, 384 U.S. at 475). The Sixth Circuit goes on to cite <u>Lego v. Twomey</u>, 404 U.S. 477, 486 (1952) for the proposition that "the prosecution must bear the burden of establishing the admissibility of a confession." The Sixth Circuit in <u>Short</u> further notes that "Rule 104 of the Federal Rules of Evidence places the burden of proving relevant preliminary facts on the proponent of the evidence - in this case, the government." <u>Id.</u> at 468 (citing <u>United States v. Vinson</u>, 606 F.2d 149 (6th Cir. 1979) and <u>United States v. Enright</u>, 579 F.2d 980 (6th Cir. 1978). Finally, the Sixth Circuit notes the Second Circuit case of <u>United States v. Burger</u>, 739 F.2d 805 (2d Cir. 1984) which reversed a conviction because the government failed to prove the voluntariness of a confession. The Sixth Circuit concludes by noting the District Court in <u>Short</u> "mistakenly placed the burden on the

Defendant."

Thus, the burden of persuasion and proving the requisite facts must rest on the government. The Court finds the government proved that Defendant was given his <u>Miranda</u> rights, but did not prove the existence or validity of the written waivers or the voluntariness thereof under the totality of the circumstances.

However, in light of the lack of notice in either of the briefs, arguments, or proof, this Court does not believe Defendant's statements should be suppressed at this time. The District Judge may opt to conduct a hearing or remand the matter back to me for further hearing and recommendations on this issue. In either event, the government will bear the burden of establishing the matters set forth herein and the Defendant will be afforded the opportunity to contest the same. Because of the state of the proof at this stage, the Court cannot make a recommendation.

## V.     Analysis: Motion to Suppress Evidence Pursuant to Rules 104, 401, 402, 403, and 404(b)

In his Motion to Suppress Evidence Pursuant to Rules 104, 401, 402, 403, and 404(b), Defendant Willyard asks that the Court enter an Order that suppresses and/or excludes any and all evidence recovered incident to the traffic stop, including the marijuana seized from his trailer, and subsequent arrest of Defendant on January 27, 2006, in Lonoke, Arkansas, should the government intend to offer said evidence at a trial of this matter. Defendant contends any and all physical items seized, as well as any statements made by the Defendant, or any other individual in connection with this case is irrelevant, and thus inadmissible pursuant to Fed.R.Evid. 402. Defendant further contends that even if the evidence is determined to have some relevance, it is excludable pursuant

to Rule 403, due to its danger of unfair prejudice, confusion of the issues, or misleading the jury, or to Rule 404 as it amounts to an inadmissible prior crime.

The Court finds that Defendant's request to suppress any and all physical items seized as well as any and all statements that may have been made by the Defendant or other co-conspirators under these evidentiary rules is premature and, at present, overly broad. Further, the Court finds the evidence Defendant requests to suppress depends on other evidence that may be offered at trial and the evidentiary foundations offered by the government in offering the evidence. Such admissibility may be impacted by other pretrial rulings of the District Court. Accordingly, this Court will refrain from recommending a ruling on Defendant's Motion in deference to Judge Phillips's conduct of the trial.[5]

---

[5]While deferring the matter of admissibility of evidence offered during trial to Judge Phillips, the Court notes Defendant wishes to exclude evidence of the marijuana seized, including testimony or photographs, on the grounds of irrelevancy. Defendant is charged with conspiracy to distribute marijuana. Being in possession of "bundles of marijuana" certainly seems, to this Court, to be highly relevant to Defendant's alleged participation in the conspiracy to distribute. [Tr. 16-17].

## VI.    Conclusion

After carefully considering the evidence introduced during the court of the evidentiary hearing and after reviewing the relevant legal authorities, it is clear there is no basis to suppress any evidence seized in this case.   For the reasons set forth herein, it is **RECOMMENDED** that Defendant Willyard's Motion to Suppress Statements and Physical Evidence **[Doc.   113]** be **DENIED IN PART** and Defendant's Motion to Suppress Evidence Pursuant to Rules 104, 401, 402, 403, and 404(b) **[Doc. 114]** be **DENIED**.[6]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[6]Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  Thomas v. Arn, 474 U.S. 140 (1985).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).