UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )        No. 3:07-CR-44
                                   )
V.                                 )        (Phillips / Shirley)
                                   )
SCOTT EDWARD WILLYARD,             )
                                   )
                Defendant.         )

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) and by the Order [Doc. 243] of the Honorable Thomas W. Phillips, United States District

Judge, for disposition or report and recommendation regarding disposition by the district court as

may be appropriate. This matter is before the Court upon Defendant Scott Edward Willyard's

("Defendant Willyard") Motion to Dismiss for Improper Venue [Doc. 93]. The parties appeared

before the Court on April 1, 2008 for an evidentiary hearing. The government was represented by

Assistant United States Attorney Hugh Ward, Jr. ("AUSA Ward"). Attorney Robert Vogel

("Attorney Vogel") appeared on behalf Defendant Willyard, who was also present. At the

conclusion of the hearing, neither party requested leave to file post-hearing briefs. Accordingly, the

Court took the matter under advisement on April 1, 2008 and is now ripe for adjudication.

I.      **Procedural Posture**

        On October 15, 2007, this Court held an evidentiary hearing on Defendant Willyard's Motion

to Dismiss for Improper Venue [Doc. 93]. On November 20, 2007, this Court filed a six page

Report and Recommendation [Doc. 184], in which it was recommended Defendant's Motion to Dismiss for Improper Venue be denied. Defendant Willyard filed a timely objection with the District Court [Doc. 195]. On February 12, 2008, Judge Phillips found since the government "did not put on any witnesses to establish venue" in the Eastern District of Tennessee, the record did not contain sufficient information to make a determination whether venue was proper; thus, this matter was referred back to the undersigned to hold a second evidentiary hearing on Defendant's Motion to Dismiss [Doc. 243]. Judge Phillips advised "counsel for both the government and the defendant should be prepared to present testimony and evidence in support of their respective positions." [Id.]. Attorney Vogel advised the Court that Defendant wished to be present at any evidentiary hearing held in this matter and requested the hearing be scheduled once his client returned from undergoing medical evaluation at the United States Medical Center for Federal Prisoners in Springfield, Missouri. Defendant Willyard returned to the Eastern District of Tennessee on Monday, March 31, 2008. Accordingly, the Court held an evidentiary hearing and heard testimony on the pending motion on April 1, 2008.

## II.     Suppression Hearing Testimony

### A.     *Luke McLaughlin*

As its first witness, the government called Luke McLaughlin ("McLaughlin"), a cooperating co-defendant. McLaughlin testified on behalf of the government pursuant to a plea agreement he entered into in November 2007 [Ex. 6]. McLaughlin testified he met Phillip Apodaca ("Apodaca") in January 1999 at the Tack Room, a restaurant in Tucson, Arizona. McLaughlin stated he engaged in drug trafficking with Apodaca. At first, McLaughlin indicated he played a minor role in the

trafficking and only participated in holding and/or moving small bales of marijuana for Apodaca. He started trafficking larger quantities of marijuana for Apodaca in 2001. His main role was to load trailers with marijuana in Tucson, which would then be driven east, including trailers which were driven to the Eastern District of Tennessee.

McLaughlin stated Apodaca's source of marijuana was Luis Erasmo Rosales Ramirez ("Ramirez"), also a cooperating co-defendant. McLaughlin also testified he met James Michael West ("West"), an indicted defendant in another drug conspiracy case in the Eastern District of Tennessee. McLaughlin testified that West was one of Apodaca's customers in the Eastern District of Tennessee and would receive 300-500 pounds of marijuana once a month. McLaughlin further testified he met with West twice: once in 2003 while he was with Apodaca and once again in 2005 in Knoxville, Tennessee.

In regard to the marijuana McLaughlin assisted Apodaca in trafficking, he testified it came from Mexico. He further indicated he helped to get stash houses for Apodaca, including one located at 3521 Bonanza, which was used to break down the incoming marijuana from Mexico, weigh it, wrap it, put it on trailers, and ship it elsewhere. McLaughlin testified quantities were sent to West in the Eastern District of Tennessee. McLaughlin was then shown utility bills from the 3521 Bonanza stash house [Ex. 7], which the witness confirmed were in his name and that service on the utilities ended in June 2005.

McLaughlin was then asked about his relationship with Defendant Willyard. McLaughlin pointed to Defendant Willyard and stated they were introduced by Apodaca in Tucson in 2004. In January 2005, McLaughlin stated he began loading Defendant Willyard's trailer with marijuana at the 3521 Bonanza stash house. McLaughlin testified Defendant Willyard was a driver for Apodaca

and started transporting marijuana to Detroit, Michigan and then drove quantities of marijuana to Tennessee. McLaughlin testified Defendant Willyard was also known as "Rocky", "HR", and "HR Hot Rod". McLaughlin further stated that in February 2005, he took a trip to Tennessee and met with Defendant Willyard at Willyard's house in Cosby, Tennessee. McLaughlin stated that he would load Defendant's trailer with wooden crates full of marijuana, which Defendant Willyard would drive to Tennessee. McLaughlin was then shown photographs of a trailer with a Tennessee license plate, which McLaughlin identified as Defendant's and as the one he loaded marijuana into [Ex. 19]. McLaughlin further stated Defendant Willyard hauled the trailer by driving pickup trucks. AUSA Ward then showed McLaughlin Exhibits 20 and 21, photographs of a Ford pickup truck, which the witness identified as one of the trucks driven by Defendant to haul the trailer.

McLaughlin then testified regarding the wooden crates that were used to store the marijuana while transporting it. He stated the wooden crates were made of plywood and that 200-250 pounds of marijuana fit into one wooden crate. He further testified he would mark the crates with the designation "car parts" so in the event the trailer was searched by the police, the marijuana might go undiscovered. He stated that Defendant would back the trailer up to a smaller garage door and they would load the crates onto the trailer from the garage.

McLaughlin further testified that in February 2005, he flew from Tucson to Knoxville for the first time. He stated he flew into Tyson-McGhee airport, rented a car, had lunch with West at the Hilton, and drove to Newport, Tennessee to meet West's driver at the Newport exit on the interstate. McLaughlin further stated Defendant Willyard was waiting in Cosby, Tennessee to transfer a 400-500 pound load of marijuana. McLaughlin stayed in Tennessee for a few days at the Holiday Inn at the Newport exit; he stated he paid cash for his room at the Holiday Inn. [See Ex. 24].

He further testified he made several more trips between February 2005 and August 2005 to transfer loads of marijuana to West at his house in Mooresburg, Tennessee. McLaughlin testified Defendant delivered these loads of marijuana to Tennessee in wooden crates using his trailer with Tennessee license plates. McLaughlin stated he left Tennessee by plane while Defendant Willyard drove back to Tucson and would bring the money he received from West back with him in the vehicle. McLaughlin further testified when he returned to Tennessee, he would stop at Defendant's house in Cosby and, on one occasion, met Defendant's girlfriend.

McLaughlin then described the two times he brought the money received from West back to Tucson. He stated he drove back to Tucson carrying the money; one time he carried a smaller amount, about $10,000 or less and the other time, he carried a larger amount of money.

McLaughlin testified he was arrested in December 2005 in St. Louis, Missouri. He stated he was driving from Detroit, Michigan to Tucson and that when he was stopped, he had $140,000 in his possession. McLaughlin testified when he was first arrested, he was interviewed by the police and originally lied to them. When he began to tell the truth, he excluded main facts. When he returned to Tucson, McLaughlin testified he stopped his main role in Apodaca's drug trafficking, but continued to work for Apodaca in a minor role, such as making phone calls. McLaughlin heard Defendant Willyard was arrested in January 2006 while driving to Tennessee to make a delivery to West. McLaughlin further stated he spoke with Defendant Willyard after his arrest. He described those conversations to the Court; he stated Defendant Willyard told him that he told the DEA he was taking the marijuana to Tennessee to deliver it to "Stick", who McLaughlin knew was one of Defendant Willyard's enemies. McLaughlin also testified that Defendant told the DEA he was coerced to participate in transporting the marijuana. McLaughlin testified that Defendant Willyard

was never threatened nor harmed to force his participation in the drug trafficking scheme.

AUSA Ward then asked McLaughlin about another co-conspirator, Daniel Ramsey ("Ramsey"). McLaughlin testified he and Ramsey are friends and have known each other since high school. McLaughlin further stated Ramsey traveled to the Eastern District of Tennessee in early 2006 to meet with West.

On cross-examination, McLaughlin testified he had contact with Defendant Willyard from 2005 to 2006. He stated he had been to Defendant's house in Cosby, Tennessee "many times" since when he came to Tennessee, he stayed in a hotel near Defendant's house. McLaughlin stated the house was a converted garage house, the garage had two doors, which were 15 feet high, and that half of the garage was used as a warehouse. He testified he met Defendant's girlfriend, Autumn, who was younger than Defendant, maybe around twenty-three or twenty-four when he first met her. He also testified she had a daughter, about five or six years old who had light colored hair.

McLaughlin further stated he started smoking marijuana with Apodaca in 1999. When asked about a shipment of marijuana to Detroit, McLaughlin stated that the shipment was not connected to West, but it was shipped in the usual way of packing up the trailer and having it driven to the designated location. McLaughlin stated he met Defendant in 2004 in Tucson and was introduced since they would be working together. He also stated that Defendant was known as "Rocky" specifically to West, so that Defendant could not be identified by name if stopped by the police.

McLaughlin testified after he was arrested, he minimized his role in Apodaca's drug trafficking scheme and stopped his direct involvement with transferring money and packing and shipping the marijuana. He stated when Defendant was arrested, he did not have any direct knowledge of the trip Defendant was making, but heard Defendant was arrested from Ramsey.

McLaughlin further stated Apodaca asked him to contact Defendant Willyard to find out what Willyard said to the police when he was arrested.

McLaughlin stated he first told law enforcement about Defendant Willyard in November 2007 when he spoke with Special Agent Lewis, Special Agent Grove, and AUSA Ward. At the interview in November 2007, McLaughlin was shown pictures of individuals involved in the West drug conspiracy, but was not shown the photographs he identified at the hearing. He further stated he was first shown the photographs identified at the hearing a week prior to the hearing. He also stated he was not shown a picture of Defendant Willyard.

McLaughlin was asked additional questions regarding the events of February 2005. He stated he gave Defendant $50,000, which represented the money owed from one trip. He testified Defendant Willyard made $100 for every one pound of marijuana he carried. McLaughlin further testified that Defendant's girlfriend, Autumn, took the money since Defendant does not count or read very well. He also stated that Defendant once delivered a car to his house in Tucson for Apodaca in the latter part of 2005.

### B.     *Daniel Ramsey*

The next witness called by the government was cooperating co-defendant Daniel Ramsey ("Ramsey"). Ramsey testified on behalf of the government pursuant to a plea agreement he entered into in March 2008 [Ex. 10]. Ramsey testified he went to high school with co-defendant McLaughlin and has known McLaughlin since 1994-1995. He met Apodaca in October 1999 at the Tack Room restaurant in Tucson, Arizona and was approached by Apodaca in 2005 to rent a drug stash house. He further stated Apodaca gave him money to sign a lease and then he moved into 8933 East Callie Pasto ("Callie Pasto"), which was used to store marijuana. Ramsey identified

Exhibit 11(a) as utility bills for the Callie Pasto residence, which were in his name and ended on December 22, 2005. He also identified Exhibit 11(b) as a photograph of the Callie Pasto residence. Ramsey testified Apodaca had him rent the stash house since he was white and his name was non-suspicious. Ramsey further testified Apodaca directed him to pick up cars which were filled with marijuana, repackage the marijuana, and reload it to send it to West in Tennessee. Ramsey testified he met West in during a visit to Tennessee in January 2006.

Ramsey testified that he was initially going to be a courier for Apodaca so he made a "dry run" during the Fall of 2005. The purpose of the dry run was to become familiar with the route and he was instructed to try to get stopped by the police to determine what questions they may ask during a traffic stop. Ramsey testified he never became a courier, but he met other couriers, including Defendant Willyard. Ramsey stated he was introduced to Defendant by Apodaca in Tucson. He further stated that in the Fall of 2005, he loaded up Defendant's trailer with marijuana to bring it to West in Tennessee. Ramsey described that the marijuana was packaged in wooden crates and he loaded the crates into Defendant's trailer. Ramsey further testified he loaded Defendant's trailer again in January 2006 with two crates, which were packed full with 12-17 bales of marijuana in each crate. [See Ex. 2(a); 2(b); 2(c)]. Ramsey stated the wooden crates were stamped with the designation "this side up." Ramsey indicated this was done to make the boxes look more professional and/or official. Ramsey also described an invoice document he created for Defendant to carry while transporting the marijuana. He stated he did this so if Defendant was stopped by the police, it could be shown to the police to potentially prevent the wooden crates from being searched. Ramsey was then shown Exhibit 22 and confirmed it was a photograph of the invoice he prepared, which included a fake phone number. When shown pictures of Defendant's

trailer and truck [Ex. 19-21], Ramsey testified he recognized the trailer, but did not recognize the photographs of the truck.

In January 2006, Ramsey stated he followed Defendant Willyard to the Eastern District of Tennessee with Apodaca. Ramsey stated he and Apodaca were in one vehicle and Defendant was driving his pickup truck with his trailer loaded with marijuana for delivery to West. Ramsey testified he and Apodaca drove all night, while Defendant stopped in New Mexico. Accordingly, he and Apodaca arrived in the Eastern District of Tennessee before Defendant would have. Ramsey testified the marijuana Defendant was driving was loaded into the trailer at another stash house he had rented for Apodaca, located at 3335 East Elida Street ("Elida residence"). Ramsey was then shown Exhibit 12(a) and confirmed these documents as copies of utility bills for the Elida residence, which were in his name. The utilities were canceled on the Elida residence in July 2006, around the same time Apodaca was arrested. Ramsey further testified that on the January 2006 visit to Tennessee, he met West at his house in the Eastern District of Tennessee. He stated he stayed in Tennessee a few days, stayed at the Holiday Inn from January 27-28 [Ex. 14], and when he left, he returned to Tucson. Ramsey further testified Defendant never arrived in the Eastern District of Tennessee with West's marijuana and that Apodaca made a few telephone calls and learned Defendant was arrested in Arkansas. Ramsey did not encounter Defendant Willyard again after his arrest in Arkansas.

Ramsey then described his duties for Apodaca. In addition to arranging to the renting of stash houses, repackaging the marijuana, and getting the proceeds from the sales, he testified he also obtained prepaid cell phones in fictitious names. Ramsey was then presented with a hard copy of telephone numbers and asked which ones, if any, he recognized [Ex. 15]. He testified he did not

recognize the telephone numbers 913-238-5683, 913-626-8229, and 520-882-4738. He testified that the area code "520" is the area code for Tucson, Arizona. He further stated the telephone number 520-981-0604 was his, the telephone numbers 520-869-1671, 520-250-3275, and 520-869-8964 belonged to Apodaca, and he thought the telephone number 520-882-4738 might have belonged to Apodaca. He testified he and Apodaca used these phones to communicate with Defendant.

On cross-examination, Ramsey was asked where was the first time he met Defendant Willyard. Ramsey stated he met Defendant Willyard at the Callie Pasto residence in Fall 2005. He and Apodaca met with Defendant to pack Defendant's trailer with marijuana. He stated the marijuana was packaged off the trailer in shipping cartons made of plywood and loaded onto the trailer using a dolly; loading the trailer was done in the garage with the door open. Ramsey testified he loaded Defendant's trailer at least three different times at the Callie Pasto residence: twice in the Fall of 2005 (maybe September and late October/early November) and once in January 2006. He stated he did not know for sure where the Fall 2005 shipments were going, but believed the late October/early November shipment was destined for delivery to West in Tennessee.

Ramsey was further asked about the jobs he performed for Apodaca; he stated Apodaca would give him the location of a vehicle filled with marijuana and he would pick it up, take the vehicle to a stash house, unload the marijuana, inventory it, and write down the quantity of marijuana received. This was done for all marijuana delivered to Apodaca.

Ramsey was then asked about cooperating with the government. He stated he met with AUSA Ward prior to the evidentiary hearing and was shown the photograph of the fictitious invoice he created for Defendant Willyard [Ex. 22]. He also stated when he signed his plea agreement, he spoke to AUSA Ward about the invoices he created. In regard to the photographs of Defendant's

trailer [Ex. 19], Ramsey stated AUSA Ward or Special Agent Lewis showed him the photograph and asked whether he recognized it as Defendant's trailer.

Ramsey was then asked about Defendant's trailer. He stated the trailer had a "flame" on the back door, three doors, two openings, was secured with straps, and had doors with locks. When asked about the truck Defendant allegedly drove with the trailer, Ramsey stated it was a darker color, the make was either a Ford or a Dodge, and he thought it would have been a model from the late 1990s or early 2000s. He remembered it was in good condition and that he did not remember any major damage.

When asked about the trip he and Apodaca made to Tennessee in January 2006, Ramsey stated they drove from Tucson in a Tahoe, took Interstate 40 the whole way, and did not stop but for gas and food. He and Apodaca took turns driving and when one of them was driving, the other would sleep and vice versa. Ramsey further testified he and Apodaca were at a rest stop in Tennessee when Apodaca discovered Defendant was arrested. He stated Apodaca panicked, dropped him off at the Holiday Inn, and continued on to West's house.

Ramsey was then asked some questions regarding the cell phones he purchased for Apodaca. He stated he did most of the purchasing and connecting of the phones, but Apodaca also connected some of them himself. He also stated Apodaca carried between four and six phones on him at once, he carried four phones on him at once, and no one ever switched phones.

## C.    *Lieutenant James Kulesa*

The government next called James Kulesa ("Kulesa"), a lieutenant with the Lonoke County Sheriff's Office, located in Lonoke County, Arkansas. Kulesa works in the Narcotics Division in the Sheriff's Office; he testified he was on duty on January 27, 2006 and encountered Defendant

Willyard on that date. Kulesa stated he assisted the Arkansas State Troopers with Defendant's traffic stop. He was not at the scene of the stop on Interstate 40, but instead met Defendant at the police station.

Kulesa stated he interviewed Defendant at 5:13 p.m. and advised him of his <u>Miranda</u> rights and identified Exhibit 18 as the Statement of Rights form Defendant signed. The form includes a series of questions which if Defendant understood, he was to write "yes" and then initial. Kulesa stated he read each statement to Defendant, Defendant answered "yes" for each statement, and placed his initials "SEW" after each yes designation. [<u>See id.</u>]. Kulesa stated Defendant Willyard never asked for an attorney. The advising of rights and subsequent interview was originally tape recorded and then transferred to a CD [Ex. 23]. Kulesa stated any portions of the conversation between he and Defendant which were not recorded were about non-germane subjects. The interview was conducted in Kulesa's office. The recording of the interview was played for the Court and reflected Kulesa's testimony that Defendant answered "yes" when asked if he understood his rights, that he was talking under his free will, and that he was not being coerced to participate.

Kulesa then described what Defendant told him during the interview. Kulesa was told that Defendant was stopped on Interstate 40 while he was pulling a trailer. Defendant was driving from Tucson and was en route to Tennessee. Defendant told Kulesa he had an "idea what was in there" (the trailer) and he was "delivering it to someone in Tennessee." Defendant further told Kulesa that he was coerced into driving the marijuana because his daughter was threatened and he was worried for her safety. Kulesa then testified that once the interview was over, Defendant Willyard was taken to detention.

On cross-examination, Kulesa testified Defendant was arrested around 11:00 a.m. on January

27, 2006 and that he first interviewed Defendant at 5:13 p.m.  He stated Defendant first spoke with

Drug Enforcement Agency ("DEA") special agents while he took photographs of Defendant's

vehicle, trailer, and the marijuana.  Kulesa informed the Court that under normal Lonoke County

Sheriff's Office procedure, he does not interview arrested individuals if the DEA is involved, unless

the person arrested requests to talk to a member of local law enforcement.  Defendant stated he

wanted to talk with local law enforcement because he was concerned about his daughter's safety in

light of his arrest.  Kulesa stated he did not know if Trooper Coleman read Defendant his Miranda

rights upon arresting him or if the DEA agents read Defendant his Miranda rights prior to

interviewing him.  When asked whether Defendant named any names during the interview in regard

to delivering the drugs, Kulesa responded that he would have to listen to the interview to be able to

answer the question; he could not remember that detail without refreshing his memory.

### D.     *Special Agent W. Kimball Hardeman*

The government next called Special Agent Kimball Hardeman ("SA Hardeman") of the

DEA.  SA Hardeman is a special agent in the DEA Little Rock District Office, which is located

within fifteen miles of Lonoke, Arkansas.  SA Hardeman was on duty on January 27, 2006, along

with SA David Younce, and first met Defendant Willyard at the Lonoke County Sheriff's Office.

SA Hardeman stated Defendant Willyard asked to speak with them and that he advised Defendant

of his constitutional rights.  AUSA Ward then showed SA Hardeman Exhibit 16, which SA

Hardeman acknowledged was the Miranda Rights Form he had Defendant fill out prior to

questioning him [See Ex. 16].  The form was signed by Defendant at 1:34 p.m., indicating the time

the interview began.  The form includes a series of questions which if Defendant understood, he was

to write "yes" and then initial.  SA Hardeman stated each statement was read to Defendant,

Defendant answered "yes" for each statement, and placed his initials "SEW" next to each question, acknowledging his "yes" designation. [See id.]. SA Hardeman stated Defendant Willyard never asked for an attorney.

SA Hardman explained what he and SA Younce were told during their interview with Defendant. He stated that Defendant told them he was traveling from Arizona and there was marijuana in his trailer. Defendant Willyard mentioned the name "Robert Haskins", and SA Hardeman asked Defendant if he would be willing to place a phone call to Mr. Haskins. Defendant agreed and attempted to reach Mr. Haskins on the phone, but was unable to. Defendant only reached Mr. Haskins's voice mail. SA Hardeman stated Defendant received an incoming phone call at the end of the interview and Defendant advised him it was Mr. Haskins, but SA Hardeman never confirmed who the phone call was from. SA Hardeman further testified Defendant provided consent to have his Cosby, Tennessee residence searched and authenticated Exhibit 17, the Consent to Search form filled out and signed by Defendant. SA Hardeman stated he did not recall what, if anything, was found at Defendant's residence.

On cross-examination, SA Hardeman stated he did not recall any conversation with Defendant prior to reading him his Miranda rights. He also stated he was unsure whether Defendant was given his Miranda rights at any time prior to 1:34 p.m. SA Hardeman was only able to testify that he gave Defendant his rights at 1:34 p.m. SA Hardeman further testified when Defendant Willyard started talking to them about the marijuana, he stated he was delivering it to Tennessee, specifically 110 Greasy Cove Road, Cosby, Tennessee, his residence, and was leaving it there for an unknown subject to pick up. Defendant Willyard also told the special agents that Mr. Haskins, who had threatened him, was going to arrange to have the marijuana picked up or was going to pick

it up himself.  SA Hardeman stated he found Defendant's statements inconsistent.

### E.      *Special Agent David Younce*

The government then called Special Agent David Younce ("SA Younce"), also with the DEA in the Little Rock District Office.  SA Younce testified he was on duty on January 27, 2006 and was present during Defendant's interview.   SA Younce corroborated SA Hardeman's testimony regarding the reading and signing of the <u>Miranda</u> Rights Form.  He stated Defendant signed and initialed the form and never asked for an attorney to be present during the interview.  SA Younce testified Defendant Willyard said he "wanted to assist with the investigation." Defendant Willyard's statement advised SA Younce that the marijuana in his trailer was to be delivered to his residence at 110 Greasy Cove Road, Cosby, Tennessee.   Defendant Willyard also stated the marijuana belonged to Robert Haskins and offered to help locate Mr. Haskins.  SA Younce also stated that at some point after the interview Defendant Willyard retained a lawyer, who provided the authorities with photographs of Mr. Haskins.  Defendant Willyard also told the agents he only agreed to drive the marijuana from Tucson because he was coerced and tortured in the desert; however, SA Younce testified he did not believe these statements.  SA Younce also testified when Defendant Willyard was arrested, he was in possession of two cellular phones.

On cross-examination, SA Younce stated he was certain Defendant understood his constitutional rights, but he had no knowledge whether Defendant was read his <u>Miranda</u> rights by anyone prior to when they read him his rights at 1:34 p.m.  He further stated Defendant's attorney from Jacksonville, Arkansas told him that Defendant wanted to cooperate in the case against Mr. Haskins, which was the basis for handing over the photographs.  SA Younce then stated he sent the information regarding Mr. Haskins to Tucson; the authorities did not try to find him in the Eastern

District of Tennessee.

### F.    *Special Agent Dave Lewis*

The government's final witness was Special Agent Dave Lewis ("SA Lewis") of the DEA, who testified he has been investigating this matter for the DEA.  AUSA Ward then showed SA Lewis Exhibit 24, which SA Lewis identified as the receipt from the Holiday Inn, Newport, showing McLaughlin stayed at the Holiday Inn, Room 143 from February 15, 2005 through February 17, 2005 and paid cash for the room.  SA Lewis also testified that in July 2006, a search warrant was executed  on properties of West, the police recovered a phone book.  SA Lewis identified Exhibit 25 as a photocopy of a page from the phone book.  The page contained the following notations: "Luke 520 401 9673" and "Phil 520 990 4127".  SA Lewis stated when he interviewed West, West confirmed the phone numbers as belonging to Luke McLaughlin and Phil Apodaca as did Apodaca when he was interviewed.

SA Lewis then explained that the DEA conducted a telephone analysis on phone numbers associated with West and Defendant [Ex. 26].  The analysis shows the phone number associated with West called the phone number identified as Apodaca's twenty-six times between December 2005 and January 2006.  The telephone analysis also showed Defendant Willyard used his phone to contact Apodaca eight times between November 2005 and December 2005.

SA Lewis further testified that on January 8, 2006, Chris Shearer ("Shearer") was arrested in Arizona.  SA Lewis testified Shearer was a money courier for West and was the original informer in these connected conspiracy cases.  When arrested, Shearer had $362,000 on his person and told SA Lewis he was on his way to meet Apodaca in Flagstaff, Arizona.  On February 14, 2006, Shearer recorded a telephone conversation and a face-to-face meeting between himself and West.  During

this conversation, Shearer advised West that his driver "Rocky" had been arrested a few weeks prior. SA Lewis identified Exhibit 28 as the recorded conversation between Shearer and West.

AUSA Ward then showed SA Lewis Exhibit 27, which he identified as Defendant Willyard's Telephone Call Frequency Records. He testified the telephones Defendant called were all Virgin Wireless (Pay as You Go) Cellular Telephones with Tucson "520" area codes. SA Lewis stated the phone number 520-981-0604 had been identified by Ramsey during his testimony. SA Lewis explained that Defendant dialed this number forty-four times between December 2005 and January 2006 (four times from 913-238-5683 and forty times from 913-626-8229). SA Lewis further testified Defendant Willyard used two different phones a total of twelve times to call Apodaca at 520-990-4128 (eight times from 913-238-5683 and four times from 423-608-1288). Further, Defendant used one of his phones, 913-626-8229, to call 520-869-1671, one of Apodaca's phone numbers, thirty-six times from January 25, 2006 through January 27, 2006, the date of Defendant's arrest.[1]

On cross-examination, SA Lewis testified the chart reflecting Defendant's Call Frequency Records, [Ex. 27], was created from subpoenaed telephone records. He testified the 520-990-4127 number belonged to Apodaca; the 520-882-4738 number was also Apodaca's according to Ramsey's testimony; the 520-981-0604 number belonged to Ramsey; the 520-250-3275 number was either Ramsey's or Apodaca's according to Ramsey's testimony; the 520-869-8964 number was Apodaca's; and the 520-869-1671 number was Apodaca's as well.

In regard to the search conducted at Willyard's Cosby, Tennessee residence, SA Lewis

---

[1]The phone numbers 913-626-8229 and 913-238-5683 match the two cell phones in Defendant's possession at the time he was arrested. See p. 15 and 21.

testified the following physical evidence was recovered: packaging material for marijuana; phone books; and "heat seal" plastic, which he stated is used to seal large bundles of marijuana. SA Lewis stated other members connected to this conspiracy have also used "heat seal" plastic. As for connecting the Cosby, Tennessee residence to Defendant and his alleged participation in the drug trafficking scheme, SA Lewis testified McLaughlin's identification of the address and his testimony that he had been there as well as Defendant stating he was going to deliver the load of marijuana he was hauling in conjunction with Apodaca's statement that Defendant was taking marijuana to the Eastern District of Tennessee, provided the connection.

SA Lewis was then asked what evidence connected Defendant Willyard to the conspiracy; he testified the February 14 statement by West referencing the "load taken off in Arkansas", the statements made by Apodaca, Arreola, McLaughlin, and Ramsey stating they knew Defendant to be a courier, the recorded conversation between West and Shearer, the seizure of the marijuana from Defendant's trailer, and West's and Apodaca's arrest and subsequent statements providing information on Defendant all support Defendant's alleged involvement in the drug trafficking conspiracy.

III.    Finding of Facts

The Court finds co-defendant McLaughlin began trafficking marijuana for Phillip Apodaca in Tucson, Arizona in 2001. McLaughlin was responsible for loading trailers of marijuana in Tucson to be driven east, including trailers which were destined for locations within the Eastern District of Tennessee. Some of these shipments of marijuana were delivered to one of Apodaca's customers, James Michael West, who lived in the Eastern District of Tennessee. McLaughlin met

Defendant Willyard in 2004 and in January 2005, McLaughlin started loading Defendant's trailer with Apodaca's marijuana for transport across the country, including transport into the Eastern District of Tennessee. Defendant Willyard transported the marijuana using a pickup truck and a trailer; the license plates on both Defendant's pickup truck and trailer were Tennessee license plates. Defendant's primary residence is located in Cosby, Tennessee; he lives there with his girlfriend, Autumn and Autumn's daughter. McLaughlin visited Defendant's residence in Cosby when he came to Tennessee in connection with the drug trafficking conspiracy.

McLaughlin's first visit to Tennessee was in February 2005; he arrived via airplane and stayed at a Holiday Inn in Newport, Tennessee from February 15 through February 17. During McLaughlin's visit, Defendant was waiting in Cosby, Tennessee with 400-500 pounds of marijuana to be delivered. Between February 2005 and August 2005, McLaughlin made several more trips to Tennessee, specifically to transfer loads of marijuana to West in Morrisburg, Tennessee. All of these loads delivered to West in Morrisburg were driven from Tucson by Defendant. Defendant would then drive back to Tucson; he would bring with him in his vehicle the money West used to purchase the marijuana.

Co-defendant Ramsey began his involvement in Apodaca's drug trafficking conspiracy in August 2005. He began his involvement by renting properties in Tucson to be used as stash houses for marijuana. Apodaca gave Ramsey money, which was used to rent 8933 East Callie Pasto and 3335 East Elida Street; both of these locations were used as stash houses to further Apodaca's drug trafficking scheme. Ramsey also packaged and loaded marijuana into trailers to be shipped to West in Tennessee.

Ramsey met Defendant in Fall 2005 at the Callie Pasto stash house. He and Apodaca met

with Defendant to load Defendant's trailer with marijuana. Defendant's trailer had a "flame" on the back door, three doors, and the doors had locks. His truck was a Ford pickup truck. The marijuana was packaged in wooden crates and then loaded into Defendant's trailer. Ramsey loaded Defendant's trailer with marijuana at least three times; twice in Fall 2005 and once in January 2006. In January 2006, Ramsey loaded Defendant's trailer with two crates of marijuana, which were packed full with between 12 and 17 bales of marijuana in each crate. Ramsey also created a fictitious invoice for Defendant to carry while transporting this shipment of marijuana. Furthermore, in January 2006, Ramsey and Apodaca drove from Tucson to the Eastern District of Tennessee. Ramsey and Apodaca began their trip following Defendant's trailer, which was loaded with marijuana packed by Ramsey. Although Ramsey and Apodaca were following Defendant at first, they arrived in Tennessee before Defendant was scheduled to arrive since they drove through the night and Defendant stopped in New Mexico. However, Defendant never made it to Tennessee since he was stopped and arrested on Interstate 40 in Lonoke County, Arkansas. Ramsey learned of Defendant's arrest from Apodaca who made a few telephone calls when Defendant never arrived in Tennessee to deliver the marijuana he was driving to West. Ramsey also arranged for prepaid cellular phones, which were set up in fictitious names.

On January 27, 2006, Defendant Willyard was arrested following a traffic stop on Interstate 40 in Lonoke County, Arkansas. Defendant was arrested around 11:00 a.m. and brought to the Lonoke County Sheriff's Office by Trooper Coleman. Upon arriving, Defendant asked to speak with law enforcement officials. He first met with DEA Special Agents Hardeman and Younce. While Defendant was being interviewed by SA Hardeman and SA Younce, Lieutenant Kulesa took photographs of Defendant's vehicle, trailer, and the marijuana in the trailer.

SA Hardeman and Younce are based out of the DEA Little Rock District Office. They were on duty on January 27, 2006 and interviewed Defendant subsequent to his arrest. The interview started at 1:34 p.m., the same time Defendant executed his <u>Miranda</u> Rights Form, which was also signed by the two interviewing agents. Defendant Willyard told the agents he was traveling from Arizona and transporting marijuana to his residence in Cosby, Tennessee for pickup by an unknown subject. Defendant mentioned the name Robert Haskins as being connected to the marijuana he was transporting, and at the direction of DEA agents, attempted to contact Mr. Haskins on the telephone. Defendant was unable to reach Mr. Haskins personally and only able to reach his voice mail. Defendant also signed a Consent to Search form, which provided permission for the authorities to search his residence at 110 Greasy Cove Road, Cosby, Tennessee. The following physical evidence was recovered from Defendant's residence: packaging material for marijuana; phone books; and "heat seal" plastic. Other individuals connected to this conspiracy have also used "heat seal" plastic. When Defendant Willyard was arrested, he had in his possession two cellular phones with the phone numbers 913-238-5683 and 913-626-8229.

Later that afternoon, at 5:13 p.m., Defendant was interviewed by Lieutenant Kulesa of the Lonoke County Sheriff's Office. Defendant told Kulesa he was worried about his daughter's safety since he was arrested and the marijuana he was hauling was seized. Kulesa advised Defendant of his constitutional rights and Defendant signed a second statement of rights form, waiving his <u>Miranda</u> rights. During the interview, Defendant told Kulesa that he was stopped while driving on Interstate 40; he was driving from Arizona to Tennessee. Defendant further told Kulesa he was pulling a trailer and also said during the interview he had an "idea what was in" the trailer and he was delivering it to someone in Tennessee.

In July 2006, a search warrant was executed on West's properties in Tennessee and a personal address book was recovered with the following notations: "Luke 520-401-9673" and "Phil 520-990-4127". West confirmed to the government that the phone numbers belonged to McLaughlin and Apodaca. Furthermore, West called Apodaca twenty-six times between December 2005 and January 2006. Defendant Willyard called 520-981-0604, Ramsey's phone number, forty-four times between December 2005 and January 2006 using both of his cell phones, 913-626-8229 and 913-238-5683. Defendant also called Apodaca at the 520-869-1671 number from the phone number 913-626-8229 thirty-six times from January 25, 2006 through January 27, 2006, the date of his arrest.

On January 8, 2006, Chris Shearer, a money courier for West, was arrested in Arizona; when arrested, he had $362,000 on his person and was on his way to meet Apodaca. On February 14, 2006, Shearer recorded a telephone conversation and a face-to-face meeting between himself and West; during the conversation, Shearer told West his driver had been arrested a few weeks before.

## IV.   Position of the Parties

Defendant Willyard moves the Court to dismiss the Second Superceding Indictment for lack of venue for the offenses alleged [Doc. 93]. Defendant argues that he has not been presented with discovery which would demonstrate that the Eastern District of Tennessee is the proper venue for trial of this matter. Defendant Willyard argues that while charged in the Eastern District of Arkansas for transporting approximately 400 pounds of marijuana, the government has not provided any evidence that connects the Arkansas crime to the crime he is charged with here in the Eastern District of Tennessee. Defendant Willyard relies, in part, on United States v. Thomas, 74 F.3d 701,

709 (6th Cir.), cert. denied, 519 U.S. 820 (1996) and United States v. Beddow, 957 F.2d 1330, 1335 (6th Cir. 1992), which provides that in order to proceed in the prosecution against the him, the government must prove by a preponderance of the evidence that venue is proper in the District Court as to each count charged. Defendant Willyard argues that since the marijuana was seized in Arkansas and delivery to Tennessee was never confirmed, it is improper to put him to trial in the Eastern District of Tennessee.

The government responds that the Defendant is charged with violating federal criminal statutes in the Eastern District of Tennessee and, as such, the District Court for the Eastern District of Tennessee is the proper venue for the case [Docs. 140 and 145]. The government argues that drug conspiracies may be prosecuted in any district in which an overt act in furtherance of the conspiracy was committed by *a* conspirator, not necessarily *each* conspirator, relying upon United States v. Crozier, 259 F.3d 503 (6th Cir. 2001) (emphasis supplied). Crozier provides that venue is proper in a district in which a co-conspirator committed an overt act in furtherance of the conspiracy, even if the defendant never entered that district. Crozier, 259 F.3d at 519.


V.      **Analysis**

The present case involves alleged violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § § 1956(a)(1)(A)(i) and (a)(1)(B)(i), conspiracy to distribute marijuana and money laundering, respectively, as charged by the government in Counts One and Two of the Second Superseding Indictment [Doc. 172]. Where a challenged to proper venue has been lodged, the government must prove by a preponderance of the evidence that venue is proper as to each count of the indictment. United States v. Thomas, 74 F.3d 701, 709 (6th Cir.), cert. denied, 519 U.S. 820 (1996).

The Constitution guarantees the right of any accused to be tried where the crime is alleged to have been committed. U.S. Const., Art. III, § 2, Cl. 3. ("Trial shall be held in the State where the said Crimes shall have been committed."). The Federal Rules of Criminal Procedure likewise provide: "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18. Cases in which the crime was allegedly committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Consequently, while venue may also be proper in another district, "venue is not limited to a single district when a crime implicates more than one location." United States v. Beddow, 957 F.2d 1330, 1335 (6th Cir. 1992).

Because venue is often appropriate in more than one district, the Sixth Circuit applies a test of "substantial contacts" to determined the proper venue. United States v. Williams, 788 F.2d 1213, 1215 (6th Cir. 1986). This test "takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." Id. (internal quotations omitted).

In a conspiracy prosecution, such as Defendant Willyard's case, venue is proper in any district where the agreement was formed or in any district where an overt act in furtherance of the conspiracy was committed. See United States v. Zidell, 323 F.3d 412 (6th Cir. 2003) cert. denied, 541 U.S. 957 (2004). In Zidell, the Sixth Circuit observed that possession with intent to distribute a controlled substance is governed by the "continuing offense" statute, 18 U.S.C. § 3237(a), under which an offense begun in one district and completed in another, or committed in more than one district, may be prosecuted in either district, "and it is not essential that the defendant ever have been

The Constitution guarantees the right of any accused to be tried where the crime is alleged to have been committed. U.S. Const., Art. III, § 2, Cl. 3. ("Trial shall be held in the State where the said Crimes shall have been committed."). The Federal Rules of Criminal Procedure likewise provide: "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18. Cases in which the crime was allegedly committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Consequently, while venue may also be proper in another district, "venue is not limited to a single district when a crime implicates more than one location." United States v. Beddow, 957 F.2d 1330, 1335 (6th Cir. 1992).

Because venue is often appropriate in more than one district, the Sixth Circuit applies a test of "substantial contacts" to determined the proper venue. United States v. Williams, 788 F.2d 1213, 1215 (6th Cir. 1986). This test "takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." Id. (internal quotations omitted).

In a conspiracy prosecution, such as Defendant Willyard's case, venue is proper in any district where the agreement was formed or in any district where an overt act in furtherance of the conspiracy was committed. See United States v. Zidell, 323 F.3d 412 (6th Cir. 2003) cert. denied, 541 U.S. 957 (2004). In Zidell, the Sixth Circuit observed that possession with intent to distribute a controlled substance is governed by the "continuing offense" statute, 18 U.S.C. § 3237(a), under which an offense begun in one district and completed in another, or committed in more than one district, may be prosecuted in either district, "and it is not essential that the defendant ever have been

24

physically present in the district in question, so long as the offense continued into this district." Zidell, 323 F.3d at 421-25.

Both conspiracy and drug importation are considered continuous crimes and they are not completed until the drugs reach their final destination. Accordingly, venue is proper in any district along the way. United States v. Turner, 936 F.2d 221 (6th Cir. 1991); see also United States v. Brika, 416 F.3d 514, 528 (6th Cir. 2005); Williams, 788 F.2d at 1216-17 (considering the district in which "the detrimental effects" of the crime are "most strongly felt" in venue analysis); c.f., United States v. Fonseca, 193 Fed.Appx. 483, 492 (6th Cir. 2006) (finding "the record replete with evidence that the overt acts in furtherance of the conspiracy took place in the Eastern District of Tennessee" where a defendant in Georgia provided methamphetamine to co-defendants who traveled from their homes in Tennessee to make the purchases from him.).

Based upon the evidence presented at the hearing, this Court finds venue for a trial on the merits is proper in the Eastern District of Tennessee. The Court starts with the fact that Defendant Willyard is charged with being part of a drug conspiracy. Conspiracy may be prosecuted in any district in which the agreement was formed, or an act in furtherance of the conspiracy occurred. See United States v. Turner, 936 F.2d 221, 226 (6th Cir. 1991). In a similar vein, Rule 18 of the Federal Rules of Criminal Procedure provides that an offense committed in one district can be prosecuted in any district in which such offense was begun, continued, or completed. While the evidence demonstrates Defendant was stopped while hauling a large amount of marijuana on Interstate 40 in Lonoke County, Arkansas, which is located in the Eastern District of Arkansas, it also shows Defendant Willyard was traveling to Cosby, Tennessee to the deliver marijuana to West, who lived in Mooresburg, Tennessee. Both of these cities are located within the Eastern District of Tennessee.

Defendant's own statement, which was given within the parameters of <u>Miranda</u>, initially informed law enforcement he was transporting marijuana from Arizona and bringing it to Cosby, Tennessee. <u>See</u> <u>United States v. Turner</u>, 936 F.2d 221, 226 (6th Cir. 1991) (finding venue proper in the Eastern District of Tennessee since "[t]here was substantial evidence introduced at trial which indicated that southeastern Michigan was the final destination for large amounts of the cocaine smuggled into the United States by the drug conspiracy in which ... [defendants] were involved."). Defendant's initial statement regarding where he brought the marijuana from (Tucson, Arizona) and where it was going (Cosby, Tennessee) was then confirmed during the evidentiary hearing before this Court by co-conspirator testimony offered by the government. The record also shows Defendant drove the drug proceeds from Tennessee back to Arizona to deliver them to Apodaca, further supporting venue in the Eastern District of Tennessee. <u>See</u> <u>United States v. Character</u>, 76 Fed.Appx. 690, 695-96 (6th Cir. 2003) (finding venue proper in the Eastern District of Michigan even though the defendant never entered the state of Michigan since the cocaine the defendant distributed in North Carolina was sent from the Eastern District of Michigan and that the defendant sent drug proceeds from North Carolina back to Michigan). Accordingly, the Court finds the government has established venue is proper in this matter for trial in the Eastern District of Tennessee by a preponderance of the evidence.

## VI. Conclusion

For the reasons set forth herein, it is **RECOMMENDED** that Defendant Willyard's Motion to Dismiss for Improper Venue **[Doc. 93]** be **DENIED**.[2]

  <u>s/ C. Clifford Shirley, Jr.</u>
United States Magistrate Judge

---

[2]Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). The District Court need not provide <u>de novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general. <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).